341 S.E.2d 588 (1986)
In the Matter of the Appeal from the ENVIRONMENTAL MANAGEMENT COMMISSION FINAL ORDER GRANTING A CERTIFICATE OF AUTHORITY TO THE ORANGE WATER AND SEWER AUTHORITY PURSUANT TO G.S. SEC. 162A-7.
No. 8510SC694.
Court of Appeals of North Carolina.
April 1, 1986.
*590 Corvette & Hassell by Ted E. Corvette, Jr., Cary, for petitioners-appellants.
Thomas S. Erwin and Moore, Van Allen, Allen & Thigpen by Charles D. Case, Raleigh, for respondent-appellee. *591 Atty. Gen. Lacy H. Thornburg by Sp. Deputy Atty. Gen. Daniel C. Oakley, Raleigh, for Environmental Management Com'n.
MARTIN, Judge.

I.
Appellants have appealed from a judgment of the Superior Court upholding the order of the EMC granting a certificate of authority to OWASA to institute eminent domain proceedings to acquire lands along Cane Creek for the purpose of constructing an impoundment reservoir. The scope of judicial review of this administrative proceeding is not in dispute. Since this matter was initiated prior to the effective date of the new Administrative Procedure Act, N.C.Sess.Laws (2d Sess., 1985) c. 746, s. 19, codified at G.S. Chapter 150B, the provisions of the Administrative Procedure Act of 1973 (APA), G.S. Chapter 150A, apply to this case. Section 51 of the APA provides in part as follows:
The court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the agency findings, inferences, conclusions, or decisions are:
(1) In violation of constitutional provisions; or
(2) In excess of the statutory authority or jurisdiction of the agency; or
(3) Made upon unlawful procedure; or
(4) Affected by other error of law; or
(5) Unsupported by substantial evidence admissible under G.S. 150A-29(a) or G.S. 150A-30 in view of the entire record as submitted; or
(6) Arbitrary or capricious.
Under the whole record test embodied in subsection (5), agency findings of fact are conclusive if, upon review of the whole record, they are supported by evidence which is competent, material, and substantial. In re Faulkner, 38 N.C.App. 222, 247 S.E.2d 668 (1978). While the reviewing court is required to consider evidence that supports and detracts from the agency ruling, it may not substitute its judgment for the agency's and may not find facts. Community Savings and Loan v. N.C. Savings & Loan Comm'n, 43 N.C.App. 493, 259 S.E.2d 373 (1979); In re Faulkner, supra. Substantial evidence is relevant evidence that a reasonable person would consider adequate to support a finding of fact. Lackey v. Dept. of Human Resources, 306 N.C. 231, 293 S.E.2d 171 (1982). See also Coastal Ready Mix Concrete Co. v. Bd. of Commissioners of the Town of Nags Head, 299 N.C. 620, 265 S.E.2d 379, reh. denied, 300 N.C. 562, 270 S.E.2d 106 (1980).
Appellants contend that when the whole record test is applied to each of the six factors listed under G.S. 150A-51, the order of the EMC fails to satisfy all but the third one. Though neither OWASA nor the EMC addresses the point, we note at the outset that appellants' argument is based on an apparent misapprehension of the law. By the very terms of the statute, the whole record test applies only with respect to the fifth listed consideration, whether the agency decision is supported by substantial evidence in view of the entire record as submitted. This interpretation is supported by the opinion of our Supreme Court in Thompson v. Board of Education, 292 N.C. 406, 233 S.E.2d 538 (1977), and by this Court's decision in the earlier appeal in this case. In both cases, the whole record test was stated with specific reference to G.S. 150A-51(5):
This standard of judicial review is known as the "whole record" test and must be distinguished from both de novo review and the "any competent evidence" standard of review.... The "whole record" test does not allow the reviewing court to replace the Board's judgment as between two reasonably conflicting views, even though the court could justifiably have reached a different result had the matter been before it de novo,... On the other hand, the "whole record" rule requires the court, in determining the substantiality of evidence supporting the Board's decision, to take *592 into account whatever in the record fairly detracts from the weight of the Board's evidence. Under the whole evidence rule, the court may not consider the evidence which in and of itself justifies the Board's result, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.
Thompson v. Wake County Board of Education, supra, at 410, 233 S.E.2d at 541 (citations omitted). See In re EMC, supra, 53 N.C.App. at 146, 280 S.E.2d at 527-28.
The other five factors involve different questions entirely. Depending on the facts of a particular case, consideration of these factors can involve scrutiny of the entire record. None of them, however, requires an evidentiary review of the same nature as that which the reviewing court is required to apply with respect to subsection (5).

II.
G.S. 162A-7 provides that water authorities seeking to acquire property by eminent domain must receive authorization from "the Board," and sets forth the procedures for doing so. "The Board" as used in the statute originally referred to the Board of Water Commissioners, G.S. 162A-2(2), whose function was succeeded to by the EMC. G.S. Secs. 143-211, 143B-282. G.S. 162A-7(c) provides that the certification may only be issued for projects that are "consistent with the maximum beneficial use of the water resources in the State and shall give paramount consideration to the statewide effect of the proposed project rather than its purely local or regional effect." The statute lists seven factors that the EMC must "specifically consider" in making its determination:
(1) The necessity of the proposed project;
(2) Whether the proposed project will promote and increase the storage and conservation of water;
(3) The extent of the probable detriment to be caused by the proposed project to the present beneficial use of water in the affected watershed and resulting damages to present beneficial users;
(4) The extent of the probable detriment to be caused by the proposed project to the potential beneficial use of water on the affected watershed;
(5) The feasibility of alternative sources of supply to the petitioning authority and comparative cost thereof;
(6) The extent of the probable detriment to be caused by the use of alternative sources of supply to present and potential beneficial use of water on the watershed or watersheds affected by such alternative sources of supply;
(7) All other factors as will, in the Board's opinion, produce the maximum beneficial use of water for all in all areas of the State affected by the proposed project or alternatives thereto.
G.S. 162A-7(c). Appellants contend that the EMC based its decision on an erroneous interpretation of this statute with the result that the overall goal of maximum beneficial use of the State's water resources was not achieved and the statewide effect of the project was ignored. They argue that the EMC placed too much emphasis on water quality, a consideration not listed in the statute, and failed to consider the listed factors sufficiently to effect the policy of the statute. Appellants rely on this Court's earlier decision in this case for the proposition that the policy of the statute requires the EMC to consider more than the exploitation and development of water resources. Appellants argue that the language of the statute leaves the EMC no choice or discretion as to which factors to consider and that giving due consideration to the interests of the State precludes consideration of such local concerns as water quality. Referring to the EMC's findings of fact dealing with water quality, and specifically to findings 19, 38, and 52, appellants contend that the EMC's decision reflects a disregard for the statutory mandate. We disagree.
To contend, as appellants apparently do, that water quality is of limited or no relevance to EMC decisions regarding *593 sources of proposed water supplies ignores one of the primary purposes of the N.C. Water and Sewer Authorities Act. G.S. 162A-1 through 162A-19. The authorities created under this Act are public instrumentalities charged with the delivery of water and sewer services to the public in a manner consistent with the objectives of the police power, including the public health and welfare. See G.S. 162A-6. Viewed in this context, we think that water quality is not only a permissible consideration for the EMC, but also one that is important if not essential to the responsible exercise of the police power. See Valevais v. City of New Bern, 10 N.C.App. 215, 178 S.E.2d 109 (1970); G.S. 160A-311. See generally 29A C.J.S. Eminent Domain Sec. 45 (1965 and Supp.1985). By arguing that the EMC may consider only the factors specifically listed in the statute, appellants advocate a more restrictive reading than the legislature, in our view, intended. The seventh listed factor is a "catch all" provision that allows the EMC to consider "all other factors as will, in the Board's opinion, produce the maximum beneficial use of water" for affected areas of the State. While directing that the EMC "shall specifically consider" the listed factors, the statute contains no language limiting the EMC's consideration to those factors. Clearly, the EMC has some latitude and discretion as to the factors to consider in each situation and the weight to be given them in reaching a decision. The only limitation is that the EMC's consideration of any factor relate to the maximum beneficial use of the State's water resources. When the alternatives proposed involve differences in water quality, then clearly water quality can be one of the "other factors" that may be considered.
As appellants point out, the EMC is required to give "paramount consideration to the statewide effect" of the proposed project. This does not, as appellants contend, preclude consideration by the EMC of local or regional factors. On the contrary, the language of the statute assumes that some consideration will be given to local and regional concerns but requires that the larger interest of the State be of "paramount" concern. Support for this interpretation may be found in Article 2 of Chapter 162A, the Regional Water Supply Planning Act of 1971, G.S. 162A-20 through 162A-25, a companion to Article 1, the Water and Sewer Authorities Act. The preamble of the Act reflects the legislative intent as regards the interaction of local and State interests. The need for regional planning and development of water systems is emphasized as "necessary in order to provide an adequate supply of high quality water to the State's citizens." G.S. 162A-21(3). The obvious purpose of the Act is to incorporate the many small water supply systems in North Carolina into a coordinated regional and statewide network. It is in this sense that statewide interests are paramount to local concerns. There is nothing in the Act that requires local concerns to be disregarded. See generally Fuller, N.C. Dept. of Water Resources Planning Report (1964).
We note finally that findings 19, 38 and 52, which appellants contend are "the heart of the EMC's decision," are only three non-consecutive findings out of a total of fifty-four. Given the important objective of providing safe drinking water to the State's population, this can hardly be called over-emphasis. In light of the principles discussed above, we think that the statutory interpretation urged by appellants is too restrictive and based on erroneous assumptions regarding legislative intent. In our opinion, the fact that the EMC made findings regarding water quality reflects an accurate interpretation of G.S. 162A-7 and is neither offensive to nor inconsistent with the policy of the Act.

III.
By its language, G.S. 162A-7 contemplates the consideration of one or more alternatives to the project for which the certificate of authority is sought. Accordingly, several alternatives to the Cane Creek project were proposed. Among these alternatives were three proposals *594 which involved piping water from three different sections of Jordan Lake, then being developed by the Corps of Engineers, to the OWASA filtration plant; three which involved piping water from Jordan Lake to University Lake; two proposals that called for pumping water from the Haw River at Bynum to University Lake or the OWASA filtration plant; and one that involved increasing the capacity of University Lake. Other proposals, such as purchasing water from Durham, were disregarded as not feasible.

a.
In their second substantive argument, appellants contend that the EMC erred because it failed to consider federal and state water quality standards in making its findings. This contention appears to be in direct conflict with appellants' position in the previous argument that water quality does not enter into the EMC's decision at all. Referring specifically to findings of fact 19 and 20, appellants contend that the EMC's consideration of water quality consisted merely of a comparison of the alternatives and not an objective evaluation based on the absolute standards contained in state and federal laws and regulations. Appellants argue that the comparison method is misleading and inaccurate and that its use by the EMC constitutes a reversible error of law. In support of this argument, appellants cite us to G.S. 143-214.1, which directs the EMC to develop a system for evaluating and classifying the water resources of the state in a manner that promotes the prudent utilization of them. The primary framework for classification under this statute is water quality and the criteria to be applied are to be drawn up in accordance with federal water quality standards.
As OWASA points out, however, appellants have completely ignored the North Carolina Drinking Water Act, G.S. 130A-311 through 130A-327, and its predecessor, G.S. 130-166.39 through 130-166.61, the stated purpose of which is "to regulate water systems within the State which supply drinking water to the public that may affect the public health." G.S. 130A-312. The Drinking Water Act directs the State Department of Human Resources, G.S. 130A-2(2), to "examine all waters and their sources and surroundings which are used as, or proposed to be used as, sources of public water supply." G.S. 130A-316 (emphasis added). With this in mind, the Department of Human Resources is directed to establish minimum standards for contaminants in drinking water and the treatment available for reducing the level of the contaminants. G.S. 130A-315. The law also provides for the amendment of the standards "as necessary in accordance with required federal regulations." G.S. 130A-315(c).
The section of the North Carolina Administrative Code that contains the water quality standards is 10D-1600 through 10D-1625. The statutory authority for these regulations is given as the North Carolina Drinking Water Act, supra, the Federal Safe Drinking Water Act, Pub. L.93-523, codified at 42 U.S.C. Sec. 300f300j9, and 40 CFR 141, the federal regulations promulgated under the Safe Drinking Water Act. A comparative reading of the federal and state statutes and the regulations promulgated under each discloses that the state standards are patterned on the federal model. For instance, the maximum permissible levels of all listed contaminantsinorganic chemicals, organic chemicals, and coliform bacteriaare the same. Compare N.C.A.C. 10D-161310D-1616 with 40 CFR 141.11141.14. The language of the State regulations is virtually identical to the federal regulations. Id.
The Final Environmental Impact Statements prepared by the Corps of Engineers and the Division of Environmental Management indicate clearly that the feasible alternatives were thoroughly evaluated in terms of the applicable standards and in accordance with the methods prescribed in the regulations. Other than generalized assertions that the EMC failed to consider this information in making its findings, appellants have not attempted to show how the data accumulated and reported in the Environmental *595 Impact Statements is inaccurate or was incorrectly gathered. It is clear that adequate data existed for the EMC to make a comparison based on water quality.

b.
Appellants seem to contend that the EMC's findings as to water quality do not reflect adequate consideration of the available data and amount to an ad hoc determination based on unspecified data, speculative and arbitrary criteria, and subjective aesthetic notions of water quality. Appellants' argument presupposes that the EMC is procedurally required in its decision to state the evidentiary basis for its ultimate findings regarding water quality. Otherwise, appellants argue, there is no assurance that the findings are based on competent record evidence or that the EMC considered the proper factors. We disagree.
The factors that the EMC is specifically directed to consider in determining whether to issue a certificate authorizing the exercise of eminent domain power are set forth in G.S. 162A-7, as noted above. While water quality is not one of them, we have already discussed how water quality is clearly an appropriate consideration. The statute makes no provision regarding how extensive the findings on any one factor are required to be or what evidence is required to support the findings made with regard to them. Any requirement that the factors be given equal weight or that specific supporting evidence exist in each situation would be impossible to satisfy and obviously was not intended by the legislature. The EMC's proceedings under G.S. 162A-7 are governed by the APA; the evidentiary standards set forth therein apply equally to any findings made by the agency. G.S. 150A-36, 150A-51. That standard, previously stated in part I, is that any finding must be supported by substantial, competent, and relevant evidence in view of the entire record as submitted. Thompson v. Board of Education, supra. If the EMC in its discretion deems water quality to be of such importance that specific findings are necessary to a sound decision, those findings must be supported accordingly. There is no statutory or other requirement that the EMC's findings regarding water quality or any other factor contain references to prescribed water quality standards, though one could easily have been imposed. Absent a clear legislative mandate, we will not require more than the APA demands. We perceive nothing about the EMC's findings regarding water quality that would render them inadequate as a matter of law to support the conclusions. Appellants' contention in this regard is without merit.

c.
It is difficult to determine from appellants' argument whether they challenge the water quality findings on the grounds that they are not supported by the evidence. Because we deem the resolution of this question important to a thorough and sound judicial review, we will treat the question as having been properly raised. We hold that the findings are amply supported.
In finding 19, the EMC found that Cane Creek was the safest and best water source of the available water sources, that it would provide water of a consistently high quality, and that it presented fewer risks than the Haw River or Jordan Lake alternatives. The data base for this finding is enormous. State and federal agencies conducted numerous tests in the course of preparing the EIS. In addition, several University and government sponsored surveys and studies on the quality of water in the drainage areas have been conducted. See U.S. Army Corps of Engineers, Final Environmental Impact Statement (1981) 38-44. Area water quality has been more or less continuously monitored pursuant to various government programs. In all, more than 66,000 individual water quality observations have been made of Cane Creek and the other alternatives since 1966. Division of Environmental Management, Final Cane Creek EIS (1982) at 55. The amount of material and the volume of raw data on water quality defies adequate summary in this opinion; such a summary would add little to the extensive and thorough *596 analyses contained in the state and federal EIS. Those analyses set forth clearly the data used, the methods employed, the criteria involved, and the assumptions made. The alternatives were evaluated in the four broad areas of contaminants listed in federal and state regulations: nutrients, synthetic organic chemicals, metals, and bacteria. They were also evaluated in terms of point source discharges and effectiveness of available treatment. Based on these evaluations, the findings of fact show the Cane Creek and University Lake alternatives to be the best sources; University Lake actually had a lower bacterial content than Cane Creek. Of these two, only Cane Creek could provide the desired yield of 10 million gallons per day. While significant improvement was noted in the water quality of Haw River and improvement was anticipated in the quality of Jordan Lake, the existence of numerous pollution discharge point sources and the presence within their drainage areas of significant amounts of urban land, developed areas, and major highways, as well as the difficulty of controlling discharges and monitoring quality in such a large area, were factors perceived as making those sources more susceptible to water quality degradation and thus not as safe. We are satisfied that the Corps of Engineers and the Division of Environmental Management evaluated the alternatives in a scientifically acceptable empirical manner. Any speculation occurred only because it was impossible with the Cane Creek and Jordan Lake alternatives to determine the quality of water in reservoirs that did not yet exist. When assumptions had to be made, they were limited. It is clear from the findings and from the record that careful attention was paid to federal and state water quality standards. Appellants' contention that these standards were ignored is without merit.

d.
As the finder of fact, the EMC is responsible under the APA for deducing the facts from raw evidence. See G.S. 150A-36. Within our judiciary it has long been recognized that there are two kinds of fact, evidentiary and ultimate facts. Williams v. Pilot Life Insurance Co., 288 N.C. 338, 218 S.E.2d 368 (1975). An ultimate fact is the result reached by processes of logical reasoning from the evidentiary facts, Farmers Bank v. Michael T. Brown Distributors, Inc., 307 N.C. 342, 298 S.E.2d 357 (1983), and is often difficult to distinguish from a legal conclusion. Id. When a trial court sits as a finder of fact, it is required under G.S. 1A-1, Rule 52, to find facts and state separately its conclusions of law. Our Supreme Court has held that the court must find only the ultimate facts on which its conclusions are based; a recitation of the evidence is not required. Quick v. Quick, 305 N.C. 446, 290 S.E.2d 653 (1982); Farmers Bank v. Michael T. Brown Distributors, Inc., supra. Though the Rules of Civil Procedure, G.S. 1A-1, Rules 1-84, do not govern proceedings under the APA, the same principles regarding ultimate and evidentiary facts apply regarding the findings the agency is required to make. With this in mind, it is clear that finding of fact 19, which appellants challenge as a conclusory finding based on unsupported assumptions, is actually an ultimate finding based on a sound evidentiary foundation. It contains a reference to other sections of the EMC's decision which include findings on the issue of water quality that are far more detailed and have a specific and identifiable evidentiary basis. Assuming arguendo that appellants are correct in their assertion that the EMC was required to state the evidentiary basis for its findings, their contention that the requirement was not satisfied is without merit.

e.
Appellants' final argument under this section appears to be that in making finding 19 the EMC established and applied standards not authorized by the State, amounting essentially to an ultra vires act. This argument is inconsistent with the position taken by appellants throughout most of their argument that the EMC either applied the wrong standards or used none *597 at all. We have already noted that water quality was an appropriate consideration for the EMC and determined that the correct standards were applied. Further discussion of these points would be unnecessarily repetitive. For reasons already stated, appellants' contention that the EMC exceeded its authority is without merit.

IV.
Appellants purportedly bring finding of fact no. 20 within their third argument and challenge it on all of the same grounds. That finding involves the costs of the various alternatives and reads as follows:
20. The reasonable estimated cost and relative ranking of the Cane Creek Reservoir and its alternatives, based on 1978 cost estimates with built-in costs for GAC (Granular Activated Carbon) filtration added to all alternatives except Cane Creek and University Lake, are set out below. The comparative costs are similar and do not provide a basis for ranking one project over the others.

 ESTIMATED COSTS AND RANKINGS OF ALTERNATIVES
 _____________________________________________
 NET PRESENT WORTH ANALYSIS
 _____________________________
 Alternative Relative Total Costs
 Ranking
 1. Cane Creek to UL 1 $16.3 Million
 2. Seg 1 Jordan L to UL 7 $19.8 Million
 3. Seg 1 Jordan L to FP 9 $21.3 Million
 4. Seg 2 Jordan L to UL 8 $20.1 Million
 5. Seg 2 Jordan L to FP 10 $21.6 Million
 6. Seg 3 Jordan L to UL 5 $18.9 Million
 7. Seg 3 Jordan L to FP 6 $19.1 Million
 8. Haw River to UL 2 $17.0 Million
 9. Haw River to FP 4 $18.5 Million
 10. University L Expansion3 $17.2 Million
 _____________________________________________________
 UL = University Lake
 FP = OWASA Filter Plant

No specific reference is made to finding of fact no. 20 in appellants' third argument, which appears to be concerned entirely with finding no. 19. Under Rule 28 of the Rules of Appellate Procedure, appellants' argument regarding finding no. 20 may be deemed to be abandoned. We have nevertheless reviewed the entire record and find therein substantial competent evidence to support the finding. Indeed, there is little about the finding that appellants could reasonably take issue with. Elsewhere in their brief, appellants object to the inclusion by the EMC of the $6 million cost of Granular Activated Carbon (GAC) treatment to the total cost of all but the Haw River and Jordan Lake alternatives. Since GAC treatment is not legally required and is not necessary to render the Haw River and Jordan Lake sources potable, appellants argue that its cost should not be reflected in the total cost. We disagree.
GAC treatment helps control algae growth in water with high concentrations of nutrients, a condition that can cause taste and odor problems. Final Cane Creek EIS, supra, at 73-75. It also helps reduce the level of synthetic organic chemicals (SOC). Id. At the time of the EMC's decision, GAC treatment was not required. The Environmental Protection Agency had, however, proposed a regulation that would have required GAC treatment for the Haw River and Jordan Lake alternatives. U.S. Army Corps of Engineers, Final Environmental Impact Statement (Cane Creek) (1981) Appendix F-21. Nevertheless, because the levels of nutrients and SOC in the Jordan Lake and Haw River sources were significantly higher than in Cane Creek or University Lake, OWASA stipulated that GAC treatment would be used with these alternatives to control taste and odor and to reduce the SOC level. Final Cane Creek EIS, supra.
In view of the public health risks associated with contaminated water, see Final Cane Creek EIS, supra at 60, OWASA obviously viewed the GAC treatment of water from Jordan Lake or the Haw River as necessary to provide its service population with water as free of contaminants as possible. While not statutorily required, the GAC treatment is clearly a means for OWASA to satisfy its police power responsibility. We agree that public health concerns warranted the inclusion of the cost of GAC treatment as a component of the total cost of the alternatives with which it would be used. Appellants argue that this artificially inflates the cost of those projects and has the effect of making them less desirable alternatives. It is true that Cane *598 Creek is the least expensive alternative only when GAC treatment is added to the Jordan Lake and Haw River alternatives. We note, however, that cost is only one of the factors that the EMC must consider and that whatever cost advantage might be gained by using one of the Jordan Lake or Haw River alternatives would have to be weighed against the consequent degradation of water quality. The cheapest alternative may not be the best one.
Appellants' contention that including the cost of GAC treatment with some of the alternatives was an error of law is without merit; the cost of GAC treatment was properly included in the cost of the Jordan Lake and Haw River alternatives. Appellants do not otherwise seriously challenge this finding and our review of the record shows clearly that it is supported by competent and substantial evidence. Assuming arguendo that the finding was somehow erroneous, appellants have not established how it was prejudicial to them. Their contention in this regard is without merit.

V.

a.
Appellants next contend that 32 of the EMC's 54 findings of fact are not supported by substantial evidence based on the entire record as submitted. Appellants purport to bring forward under this single argument 81 exceptions and 27 assignments of error. In a related argument, appellants contend that the EMC erred in failing to find certain facts which they contend are supported by the record. This argument is based on a single assignment of error and 43 exceptions. In support of this argument, appellants set out the findings which they contend should have been made followed by a parenthetical reference to the place in the record where supporting evidence appears.
None of the 28 assignments of error or the 124 exceptions encompassed within these two arguments are addressed specifically in appellants' brief. Appellants instead take a broadened approach, arguing that all of the challenged findings are based on evidence which is either incompetent or so weak and speculative as to have no probative value. While the assignments and exceptions are specific enough, appellants' general argument amounts to no more than a broadside request for this Court to wade through the voluminous record to determine whether any of the assignments of error has merit or whether any of the exceptions has a legal basis. This is ineffectual to present a question for our review. Rule 28 of the Rules of Appellate Procedure provides that "[e]xceptions... in support of which no reason or argument is stated or authority cited, will be taken as abandoned." This has been interpreted by our Courts to require that a question purportedly raised by an assignment of error or exception be presented and argued in the brief in order to obtain appellate review. Stanley v. Stanley, 51 N.C.App. 172, 275 S.E.2d 546, disc. rev. denied, 303 N.C. 182, 280 S.E.2d 454, app. dismissed, 454 U.S. 959, 102 S.Ct. 496, 70 L.Ed.2d 374 (1981); Love v. Pressley, 34 N.C.App. 503, 239 S.E.2d 574 (1977), disc. rev. denied, 294 N.C. 441, 241 S.E.2d 843 (1978). Appellants' non-specific arguments merely reiterate the assignments of error and are not effective to present them for review by this Court. See State v. McMorris, 290 N.C. 286, 225 S.E.2d 553 (1976); State v. Brothers, 33 N.C.App. 233, 234 S.E.2d 652, disc. rev. denied, 293 N.C. 160, 236 S.E.2d 704 (1977).

b.
In the interest of a thorough review, we have considered appellants' arguments which raise the single question of whether the EMC's findings are supported by competent and substantial evidence based on the whole record as submitted. We find appellants' arguments to be without merit. Appellants contend that much of the expert testimony presented by OWASA is incompetent because it is speculative and lacks a proper evidentiary foundation. This argument is premised on appellants' assertion that North Carolina law requires an expert to base his opinion on facts within *599 his personal knowledge or on evidence in the record before the court. As authority for their arguments, appellants rely on the 1967 case of Todd v. Watts, 269 N.C. 417, 152 S.E.2d 448 (1967), and Stansbury, N.C. Evidence Sec. 136 (rev. ed. 1973). Those authorites state the rule formerly applicable in this jurisdiction that the facts on which an expert bases his opinion must be recited in a hypothetical question. G.S. 150A-29 provides that contested cases heard under the APA be conducted in accordance with the same rules of evidence that apply in the judicial courts. The requirement that a hypothetical question be used to elicit expert testimony was abolished by G.S. 8-58.12 (effective 1 October 1981), which was the rule in effect when the EMC heard evidence in this case in November and December of 1982. G.S. 8-58.14 provides: "Upon trial, the expert may testify in terms of opinion or inference and give his reasons therefore without prior disclosure of the underlying facts or data, unless an adverse party requests, [sic] otherwise, in which event the expert will be required to disclose such underlying facts or data on direct examination or voir dire." This rule, which has since been repealed, N.C. Sess. Laws (Regular Sess. 1984) c. 1037, s. 9, is essentially the same as G.S. 8C-1, Rule 705, which superseded it in 1984. 1 Brandis N.C. Evidence Sec. 136 (Supp.1983). Regarding the new rule, this Court has recently said, "[a]n expert need not testify from personal knowledge as long as the basis for his or her opinion is available in the record or upon demand." Thompson v. Lenoir Transfer Co., 72 N.C. App. 348, 350, 324 S.E.2d 619, 620-21 (1985). See generally Blakey, Examination of Expert Witnesses in North Carolina, 61 N.C. L.Rev. 1 (1982) (discussing the evolution and application of G.S. 8-58.14). Prior disclosure of the facts supporting the opinions of the experts was not required by hypothetical question or otherwise, except upon appellants' demand. Appellants do not argue that their requests for disclosure of these facts were denied nor do they demonstrate how, with respect to any of the assignments of error or related exceptions, the expert testimony on which the challenged findings were based is not founded on facts or data in the record. Though appellants do not specifically raise the question, we note for purposes of clarification that, under the law then in effect, expert testimony was not objectionable because it contained an opinion on the ultimate issue. State v. Sparks, 297 N.C. 314, 255 S.E.2d 373 (1979). See generally, 1 Brandis, N.C. Evidence Sec. 126 (1982). We note further that G.S. 150A-29(a) permits the admission of reliable hearsay evidence in certain circumstances which, in our opinion, are present in this case. Appellants' argument that the evidence is not competent is without merit.

c.
Having established that the evidence supporting the challenged findings is competent, we now consider whether it is sufficient to support the findings. The whole record test requires that the reviewing court consider not only evidence which supports the findings made, but that which detracts from them as well. Boehm v. N.C. Bd. of Podiatry Examiners, 41 N.C. App. 567, 255 S.E.2d 328, cert. denied, 298 N.C. 294, 259 S.E.2d 298 (1979). It is with this principle and those discussed in part I of this opinion in mind that we consider the findings that appellants contend should have been made. Based on our review of the record, unaided by appellants' bare assertions, these proposed findings and the evidence on which they were based are for the most part reflected in the findings that actually were made; to the extent that they are not thus reflected, they do not conflict with the findings made. Where the evidence which supports the proposed findings conflicts with the evidence that supports the EMC's findings, it does not detract from the EMC's findings sufficiently, in our opinion, to compel the conclusion that any of the EMC's findings lack adequate support. The EMC's findings are comprehensive and show every indication that all of the relevant, competent, and *600 substantial evidence was considered, as discussed more fully in part VI. The Superior Court order affirming the EMC's decision indicates clearly that its review of this question was in accordance with the mandate of In re EMC, supra.
Aided by OWASA's brief, our own review of the whole record in this case reveals that the challenged findings have adequate support. When the EMC's findings were based on expert opinion, the opinion was supported by information in the record. The opinions were elicited from qualified experts in accordance with the rules of evidence and appellants were allowed sufficient opportunity for cross-examination. Otherwise, the findings are based on data that is beyond serious dispute or evidence that is manifestly credible. Appellants have not attempted to demonstrate, except in the most general sense, how the challenged findings lack sufficient evidentiary support. In the interest of a thorough review, we have considered appellants' vague and non-specific arguments more thoroughly than either the law requires or their brief warrants. Their arguments are unpersuasive and we find the assignments of error purportedly brought forward thereunder to be totally lacking in merit.

VI.
Appellants next contend the findings are legally insufficient to support the EMC's conclusions of law. They argue essentially that the EMC is required to make findings on each of the seven factors listed under G.S. 162A-7(c) and that those findings must support a conclusion that the proposed project is "consistent with the maximum beneficial use of the water resources of the State giving paramount consideration to the statewide effect of the proposed project rather than its purely local effect." Appellants claim that the findings on three of those factors
(1) The necessity of the proposed project;
(2) The extent of the probable detriment to be caused by the proposed project to the present beneficial use of water in the affected watershed and resulting damages to present beneficial users;
....
(5) The feasibility of alternative sources of supply to the petitioning authority and the comparitive cost thereof;
are insufficient to support the conclusion that Cane Creek is the best project. We disagree.
G.S. 162A-7(c) requires only that the EMC "specifically consider" the listed factors. Neither the statute nor our earlier decision in this case requires the EMC to make findings regarding each factor. See In re EMC, supra. Nevertheless, making those findings is a means of insuring that each factor is specifically considered and we endorse this approach, though we do not require that it be followed. Appellants' argument consists in part of a contention that the findings do not accurately reflect the picture presented by the evidence. We have already considered this contention and have already determined in part V, above, that the findings are adequately supported in the record. Further discussion of this issue would serve no useful purpose.
With regard to whether the findings reflect adequate consideration by the EMC of the factors listed in G.S. 162A-7(c), our review of the record shows affirmatively that they do. We previously discussed, in part II, how water quality, though not a listed factor, had obvious importance and noted, in part III, that it was thoroughly considered by the EMC. In part IV, we noted that the factor of cost received a similarly thorough consideration. With regard to the remaining factors, we hold that the EMC's decision reflects adequate consideration.
Findings 5 through 11 are contained in a section of the decision designated "Necessity of Project." Those findings discuss the history of the water shortage problem in OWASA's service area and note the projected demand. Clearly they support the conclusion that an additional water supply is needed. There is no requirement that the EMC find with regard to this factor that the proposed project is the only *601 one that will meet this need, as appellants seem to argue. Rather, this factor appears to be designed to insure that a need exists and that the proposed project is capable of meeting it. The EMC's findings reflect the correct interpretation of that factor.
Paralleling the statute, the next section of the decision is entitled "Storage and Conservation of Water." It contains 3 findings. In essence, these findings state that the Cane Creek reservoir will have a storage capacity of 3 billion gallons with a safe daily yield of 10 million gallons that would not otherwise be utilized; and further that the Cane Creek reservoir would provide water of a quality that could not be matched by Haw River or Jordan Lake. Clearly, these findings address G.S. 162A-7(c)(2).
Regarding the detriment of the proposed project to present and potential beneficial uses of water in the watershed and danger to users, the EMC made 3 findings to the effect that the relatively insignificant detriment would be offset by the benefits that would result. Appellants argue that these findings give insufficient consideration to the socio-economic impacts on the Cane Creek community, directly disregarding the previous mandate of this Court in In re EMC, supra. While not contained in this section, the EMC did make findings regarding the socio-economic impact and included them under the section entitled "Other Factors Producing Maximum Beneficial Use." Those findings note that there will be unavoidable losses of forested land and land presently given over to farming activities; that portions of several farms will be inundated; that one family will have to move; and that the closing of state roads would inconvenience some of the affected people. The EMC further found, consistent with appellants' argument, that the other alternatives have a lesser likelihood of community disruptions or relocations. In our opinion, these findings reflect a consideration of the evidence on these points adequate to satisfy the statute and the mandate of In re EMC, supra. This question is discussed further in part VII, infra.
The EMC's findings regarding the feasibility of alternatives and the comparative costs were thoroughly discussed in part IV. They require no further discussion here except to reiterate that the cost of GAC treatment was viewed by OWASA as necessary for any of the Haw River or Jordan Lake alternatives to be feasible.
The section of the EMC's decision entitled "Detriment From Use of Alternatives to Present and Potential Beneficial Uses of Water in Their Watershed" contains 8 findings. These findings address primarily the differences in water quality among the feasible alternatives, an issue that was thoroughly discussed in part III above. We note here only that the use of any of the Jordan Lake or Haw River alternatives would have a detrimental effect on the quality of OWASA's raw water supply. Additionally, the EMC found that none of the other alternatives would create an additional supply of water of the volume of the proposed Cane Creek reservoir.
Under the "Other Factors Contributing to Maximum Beneficial Use" section, which contains 24 findings, the EMC discusses the socio-economic and environmental impact of the Cane Creek reservoir project. On the basis of the record, these were clearly the most thoroughly debated points and were the focus of much attention from all sides. We remanded this case when it was first appealed in part for more thorough consideration of these issues. The essence of the EMC's findings is that there will be some unavoidable impacts associated with the project that would not be associated with the others. The socio-economic displacement was viewed as minor and the project was found to have an effective package for mitigating environmental damage. The overall benefits to be gained from the use of Cane Creek to meet OWASA's water supply needs were found to outweigh the negative impacts of the project.
The final two factual sections of the EMC's decision include two findings, more properly labeled conclusions, (1) that the Cane Creek project in adding 3 billion gallons *602 to the State's water supply would be consistent with the maximum beneficial use of State water resources, and (2) that the proposal was consistent with the State water resources planning policy.
We think that the EMC's findings indicate that all of the factors listed under G.S. 162A-7(c) received the "specific consideration" that the EMC was required to give them. In addition, the EMC gave thorough consideration to factors that were not specifically listed, but were nevertheless of great importance to a sound determination. Appellants' contention is without merit.

VII
Based on its findings, the EMC made the following substantive conclusions of law:
3. The project proposed by OWASA is necessary to address its water needs and will promote the storage and conservation of water by means of its impoundment.
4. The project proposed by OWASA will cause little detriment to present or potential beneficial uses of water in the Cane Creek watershed area, and will cause little resulting damage to present beneficial users.
5. There are several alternatives to the project proposed by OWASA which may feasibly be implemented and these projects all have comparable costs.
6. The principle alternative sources of supplyHaw River and Lake Jordanwould not increase the storage and conservation of water, would eliminate the addition of the Cane Creek supply source to the resources of the State, and would subject the OWASA service area to increased pollution potentials and risks from pollution inputs. The University Lake expansion alternative will not meet the water supply needs of OWASA.
7. The project proposed by OWASA will preserve and utilize a well-protected water supply resource, and will promote the beneficial use of those waters, consistent with the water use policies of the State.
8. The project proposed by OWASA is consistent with the maximum beneficial use of the water resources in the State giving paramount consideration to the statewide effects of the project, rather than to its purely local or regional effect.
9. OWASA is entitled to the certificate pursuant to N.C.G.S. 162A-7 authorizing it to institute proceedings in the nature of eminent domain to acquire water, water rights or lands having water rights attached thereto.
With one exception, appellants' argument that these conclusions are not supported by the findings is vague and unsupported by legal authority. That exception is appellants' final argument, in which they contend that the findings regarding the closing of the state roads and resulting inconvenience do not support the EMC's fourth conclusion. They argue essentially that the EMC, or several members of it, misunderstood the EMC's fact finding function and its ability to take steps to mitigate the negative impacts of the project. Appellants support this argument by reference to a discussion which occurred just before voting on the motion to adopt the hearing examiner's recommended decision, as amended. Several EMC members, including the chairman and the hearing examiner, made remarks indicating their concern over the closing of two state roads that would apparently result from the project. The members discussed among themselves and with the attorneys the steps that the EMC could take to mitigate this damage or to insure further inquiry and appropriate action by the Orange County Commissioners. Appellants contend that these remarks indicate (1) that the EMC misconstrued In re EMC, supra, to the end that local socio-economic and environmental impacts were inadequately addressed and (2) that the EMC was misinformed as to its ability to condition issuance of the certificate of authority on further action. We disagree.
As already noted, the record indicates that ample opportunity was allowed for presentation of evidence on these issues *603 and the EMC's findings indicate a thorough consideration of that evidence. That the findings reflect that some detriment, including inundation of two roads and displacement of one family, will result from the project is not inconsistent with the conclusion that that detriment would be relatively minor.
We further think that the hearing examiner's remarks regarding the EMC's responsibility to consider the State's interests, far from being a misapprehension of the law, indicate a proper understanding of the EMC's function as well as the policy of G.S. 162A-7(c) that the interests of the State be "paramount" to local concerns. Finally, while some Commission members expressed a desire to issue a resolution to the county commissioners or take other action regarding the inundation of the roads, no request was made for an investigation into this possibility. The motion before the EMC was unambiguous. Had the individual members' reservations on any point been strong enough, they could have voted against the motion. G.S. 162A-7(c) allowed the EMC to grant a certificate in whole or in part or to deny it altogether. Appellants' contention on this point is without merit.
Appellants contend briefly and without authority that the EMC acted outside of its statutory authority in issuing the certificate and thereby violated the United States and North Carolina Constitutions. This purported argument is merely a reiteration of appellants' similarly phrased assignment of error and does not effectively present the constitutional question for review. N.C.App.R. 28(a); Martin v. Housing Corp., 277 N.C. 29, 175 S.E.2d 665 (1970); Sykes v. Clayton, Comr. of Revenue, 274 N.C. 398, 163 S.E.2d 775 (1968). We therefore decline to consider it.
As to the remainder of appellants' argument that the facts do not support the legal conclusions, we find it unpersuasive. Our careful review of the record shows that the EMC's decision parallels G.S. 162A-7(c) in its consideration of relevant factors. We think that the conclusions drawn from the findings were proper and that the EMC's decision is supported by competent, substantial evidence in view of the entire record as submitted. Appellants' contention in this regard is without merit.
The order of the Superior Court affirming the order granting OWASA's request for the certificate of authority and dismissing the appeal of petitioners CCCA and Teer Farms, Inc. is
Affirmed.
HEDRICK, C.J., and JOHNSON, J., concur.